UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>Daniel Miguel Rush,<br><br>        Defendant. | Court File No. 15-cr-105 (SRN/LIB) (1)<br><br><br><br>**REPORT AND RECOMMENDATION** |

This matter comes before the undersigned United States Magistrate Judge upon Defendant Daniel Miguel Rush's ("Defendant") Motion for Suppression of Evidence Obtained without a Warrant, [Docket No. 18]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on May 26, 2015, regarding the parties' pretrial motions.[1] The parties declined the opportunity to submit supplemental briefing regarding the motion to suppress, and the Court took Defendant's Motion for Suppression of Evidence Obtained without a Warrant, [Docket No. 18] under advisement on May 26, 2015.

For reasons discussed herein, the Court recommends that Defendant's Motion for Suppression of Evidence Obtained without a Warrant, [Docket No. 18], be **DENIED**.

## I. BACKGROUND AND STATEMENT OF FACTS

### A. Background

Defendant is charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and one count of being a felon in possession

---

[1]The Court addressed the parties' pretrial discovery motions by separate order, [Docket No. 22].

of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Indictment [Docket No. 1]).

### B. Facts[2]

The record presently before the Court indicates that at approximately 4:00 a.m. on January 30, 2015, officers of the Duluth Police Department executed a state court warrant to search the premises of the second floor apartment located at 114 East Third Street in Duluth, Minnesota ("the Apartment"). (May 26, 2015, Motions Hearing, Digital Recording at 11:11:50-11:12:05 a.m.; 11:13:15 a.m.; 11:28:40 a.m.). Officer Jason Eikam participated in the investigation that led to the search of the Apartment. (Id. at 11:11:35-11:11:40 a.m.). The investigation that led to the issuance of the state court warrant to search the Apartment revealed that, in the days leading up to the execution of the search warrant, narcotics sales (some of which were the subject of controlled buys organized by law enforcement) had been taking place at the Apartment, and that during those sales, firearms had been in plain view. (Id. at 11:12:05-11:13:00 a.m.).

Immediately prior to the execution of the state court search warrant on January 30, 2015, Officer Eikam was conducting surveillance of the building in which the Apartment was located. (Id. at 11:13:25-11:13:45 a.m.). While conducting surveillance, Officer Eikam spotted two individuals enter and leave the apartment building who were specifically targeted during the investigation on suspicion that they had been selling narcotics. (Id. at 11:14:05-11:14:40 a.m.). Neither of those individuals was Defendant. (See Id.). The investigating officers had general information that numerous other individuals were involved in the use and sale of narcotics inside the Apartment. (Id. at 11:14:40 a.m.).

---

[2] The Court's statement of facts is derived from the testimony of Officer Jason Eikam of the Duluth Police Department at the May 26, 2015, motions hearing.

In executing the state court warrant to search the apartment, a tactical response team made the initial entry into the apartment. (Id. at 11:15:00 a.m.). The reports of the members of the tactical response team indicated that they had made contact with a total of fourteen individuals in the Apartment, including Defendant who was first encountered lying on a mattress located in the Apartment's living room. (Id. at 11:15:10-11:15:35 a.m.; 11:15:55-11:16:05 a.m.).[3] The tactical response team also reported that they had encountered various firearms in the apartment and hypodermic needles in plain view. (Id. at 11:15:35-11:15:50 a.m.).

At an unknown point between the tactical response team's initial entry into the Apartment and when Officer Eikam later entered the Apartment (which occurred sometime after he conducted the challenged pat-down search of Defendant), officers discovered a sawed-off shotgun on the mattress where the tactical response team had first encountered Defendant laying. (Id. at 11:16:05-11:16:20 a.m.). Officer Eikam testified that either the tactical team that initially entered the Apartment or the officers who entered thereafter could have discovered the shotgun on the mattress, but that he was not sure how or when it had first been discovered. (Id. at 11:16:05-11:16:20 a.m.). Officer Eikam could, however, see the shotgun still in plain view on the mattress in the living room when he eventually entered the apartment. (Id. at 11:16:35 a.m.).

Because of the significant presence of firearms and other contraband in plain view in the Apartment, the officers executing the state court search warrant decided to remove the fourteen encountered individuals from the Apartment. (See Id. at 11:16:55-11:17:10 a.m.). The tactical response team began removing individuals from the apartment within two minutes after their initial entry. (Id. at 11:34:45 a.m.). As the officers secured each individual with a zip-tie or handcuffs, the officers sent the individual out the door of the Apartment, where Officer Eikam

---

[3] Other than a single person, who was not Defendant, the state court search warrant did not specifically authorize a search of individuals who were in the apartment at the time the search was to be executed. (Id. at 11:30:10 a.m.).

stood on a landing two or three steps down from the door to conduct pat down searches on those individuals. (Id. at 11:17:10-11:17:35 a.m.).[4] Officer Eikam testified that he conducted the pat down searches of the secured individuals because the investigation had produced general information that there were weapons in the Apartment and because he had overheard the tactical response team members' comments about the presence of firearms in the Apartment. (Id. at 11:17:35-11:17:50 a.m.). Defendant was among the first several individuals removed from the apartment. (Id. at 11:37:40 a.m.).

Officer Eikam had encountered Defendant previously and immediately recognized Defendant, whom he knew to be a convicted felon prohibited under federal law from possessing firearms or ammunition, when Defendant exited the door of the Apartment. (Id. at 11:19:15 a.m.; 11:27:20 a.m.). At that time, Officer Eikam was only generally aware that firearms had been found in the apartment and was not aware that a shotgun had been found on the mattress on which Defendant was laying when initially encountered by the tactical team. (Id. at 11:19:40-11:19:50 a.m.). Officer Eikam later testified that he had no specific information at the time Defendant exited the Apartment to indicate that Defendant had a weapon on his person. (Id. at 11:37:30 a.m.).

Because he was generally aware that the tactical team had found both narcotics and firearms in the Apartment and because Officer Eikam was concerned about the safety of the law enforcement officers, Officer Eikam asked Defendant if he had any weapons on his person, to which Defendant responded that he had some hypodermic needles[5] and possibly a pipe in his

---

[4] Officer Eikam testified that a flight of ten to twelve stairs led up from the front door of the building to a small landing where he conducted the pat down searches, and there was another short flight of two or three steps that led from the landing to the door of the Apartment. (Id. at 11:19:00 a.m.).

[5] Defendant referred to the items in his pockets as hypodermic needles. (See Id. at 11:20:20-11:20:50 a m.).Officer Eikam clarified at the motions hearing that his references to hypodermic needles referred to syringes. (See Id. at 11:44:40)

pockets. (Id. at 11:20:20-11:20:50 a.m.). Officer Eikam asked Defendant whether the needles had been capped, to which Defendant responded that he did not know. (Id. at 11:21:15-11:21:20 a.m.). Officer Eikam became concerned that an uncapped hypodermic needle could injure someone, including Defendant. (Id. at 11:21:20-11:21:30 a.m.).

    Officer Eikam patted down the outside of Defendant's right front pants pocket and felt an object in that pocket that he thought was a hypodermic needle. (Id. at 11:22:00-11:22:30 a.m.). Officer Eikam's pat down indicated to him that the object was the approximate diameter of a hypodermic needle and that, because of the orientation of the object he could remove it without risking being pierced by an uncapped needle. (Id. at 11:22:30-11:22:45 a.m.; 11:23:15-11:23:50 a.m.). Officer Eikam reached into Defendant's pocket and removed a hypodermic needle. (Id. at 11:23:50-11:24:05 a.m.). While doing so, Officer Eikam detected a second object in Defendant's right front pocket, but he was not sure whether the object was a pipe or a second hypodermic needle. (Id. at 11:24:05-11:24:10 a.m.). Officer Eikam again reached into Defendant's pocket to remove the object and realized as he did so that the object was a shotgun shell. (Id. at 11:24:10-11:24:20 a.m.). Officer Eikam returned the shotgun shell to Defendant's pocket. (Id. at 11:24:50 a.m.). He then checked Defendant's left front pocket, in which he found and then removed a second hypodermic needle and a glass pipe. (Id. at 11:24:20-11:24:24 a.m.). Defendant was cooperative during the encounter. (Id. at 11:38:45 a.m.).

    Following the pat down search, Defendant was taken down the remaining stairs, outside of the building and, at some point transported to the Duluth Police Department. (Id. at 11:25:55-11:26:05 a.m.). At some time later, apparently after transport to the Duluth Police Department, Officer Tyler Bodin conducted an inventory search of Defendant in which he recorded the presence of the shotgun shell on Defendant's person. (Id. at 11:26:30 a.m.).

Defendant was later indicted with the Federal charges now against him. On May 4, 2015, Defendant filed the present motion to suppress.

## II.   DEFENDANT'S MOTION FOR SUPPRESSION OF EVIDENCE OBTAINED WITHOUT A WARRANT, [DOCKET NO. 18]

Defendant moves the Court for an order suppressing any evidence obtained as a result of Officer Eikam's pat down search of Defendant's person on January 30, 2015. (Def.'s Motion for Suppression of Evidence Obtained without a Warrant, [Docket No. 18]).  Defendant contends that the Court must suppress the results of the search, arguing that Officer Eikam had no basis to suspect that Defendant was then linked to the presence of narcotics or firearms in the Apartment.

### A.   Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. Amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness[.]'" Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006).  "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." Terry v. Ohio, 392 U.S. 1, 17-19 (1968) (citing Kremen v. United States, 353 U.S. 346 (1957); Go-Bart Importing Co. v. United States, 282 U.S. 344, 356-358(1931); United States v. Di Re, 332 U.S. 581, 586-587 (1948)). "The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." Id. at 19 (citing Warden v. Hayden, 387 U.S. 294, 310 (1967); Preston v. United States, 376 U.S. 364, 367-368 (1964); Agnello v. United States, 269 U.S. 20, 30-31 (1925)).

### B.   Analysis

Defendant challenges the validity of the search of his person, which occurred as he was being removed in handcuffs from the Apartment shortly after the officers began executing the

state court warrant to search therein. However, as it is undisputed that the tactical response officers initially seized Defendant when they placed Defendant in handcuffs upon first encountering him upon their initial entry into the Apartment, the Court begins its analysis with that seizure.

1. Initial Seizure

In <u>Michigan v. Summers</u>, 452 U.S. 692 (1981), the United States Supreme Court "defined an important category of cases in which detention is allowed without probable cause to arrest for a crime. It permitted officers executing a search warrant 'to detain the occupants of the premises while a proper search is conducted.'" <u>Bailey v. United States</u>, 133 S. Ct. 1031, 1037 (2013) (quoting <u>Summers</u>, 452 U.S., at 705). "Such detentions are appropriate, [the Supreme Court] explained, because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." <u>Muehler v. Mena</u>, 544 U.S. 93, 98 (2005) (citing <u>Summers</u>, 452 U.S. at 705). In <u>Muehler</u>, the Supreme Court held that "[i]nherent in <u>Summers'</u> authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." <u>Id.</u> (citing <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)).

In <u>Muehler</u>, officers executing a search warrant entered the residence of Iris Mena at 7:00 a.m., where they found Mena asleep in her bedroom. <u>Id.</u> at 96. The officers placed Mena, who was not herself suspected of criminal activity, in handcuffs and detained her in a converted garage attached to the residence for two to three hours while the officers executed the warrant to search Mena's residence. <u>Id.</u> Mena later brought a § 1983 suit, arguing that the detention had violated her rights under the Fourth Amendment and asserting that the officers had detained her for an unreasonable time and in an unreasonable manner, in part as it became clear during the

prolonged detention that Mena did not pose a threat to the officers. Id. at 96-97. The Supreme Court held that Mena's detention in handcuffs in the attached garage for the duration of the execution of the search warrant was permissible under Summers, holding "[a]n officer's authority to detain incident to a search [warrant] is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" Id. at 98 (quoting Summers, 52 U.S., at 705, n. 19) (alterations added).

The Court sees no material distinction between Mena's detention in Muehler, supra, and the initial placement of the Defendant in handcuffs here in the present case. Accordingly, the initial detention of Defendant in handcuffs by the officers executing the warrant was lawful under Summers and Muehler. The general rule, however, is that the execution of a search warrant does not, without more, authorize the search of an individual not named in the warrant who is merely found on the premises to be searched. See Ybarra v. Illinois, 444 U.S. 85 (1979) (holding that a person's mere proximity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person); see also United States v. Clay, 640 F.2d 157, 160 (8th Cir. 1981) ("An investigatory search will be found constitutionally permissible only when supported by reasonable suspicion directed to the person to be searched, and [this] requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." (quoting, Ybarra, 444 U.S. at 89-91)).

In the present case, Officer Eikam's limited knowledge of the Defendant's mere proximity to the presence of narcotics and firearms discovered at the Apartment at the time of the initial execution of the state court search warrant by the tactical officers would, under Summers, supra, and Muehler, supra, support the detention of Defendant during the initial phase of the

premises search. However, there is nothing in the present record that would support the search of Defendant's person pursuant to the state court warrant because there in nothing in the record to suggest that Officer Eikam had probable cause to believe that Defendant had been anything other than merely present at the apartment at the time of the initial execution of the state court search warrant and the time of Officer Eikam's search of Defendant's person.

2. Pat Down Search

The Government argues that Officer Eikam's pat down search of Defendant was lawful either as a search for officer safety, a search pursuant to Terry v. Ohio, 392 U.S. 1 (1968), or a search incident to an arrest.

a. Officer Safety

Prior to Officer Eikam patting Defendant down, Defendant revealed to Officer Eikam that he thought he had hypodermic needles in his pockets and that they may be uncapped. Officer Eikam testified that he conducted a pat down search of Defendant for the safety of officers and others, in part because Defendant indicated the presence of hypodermic needles, and in part, because the officers who had already entered the Apartment had made generalized comments that firearms had been observed therein.

Courts apply an objective test to determine whether a police officer had reasonable, articulable suspicion for a pat-down frisk. Terry, 392 U.S. at 27. "To pass this test, the officer does not need to be certain that the suspect was armed . . . . a pat-down is permissible if a 'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" United States v. Horton, 611 F.3d 936, 941 (8th Cir. 2010) (quoting Terry, 392 U.S. at 27). "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be

suppressed." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (citing Sibron v. New York, 392 U.S. 40, 65–66 (1968)).

Officer Eikam testified that, at the time that he conducted the pat down search of Defendant, he had no specific basis to believe that Defendant was connected to the firearms or narcotics found in the Apartment. Officer Eikam was, however, concerned that an uncapped hypodermic needle might pose a danger to Defendant, officers, or others. Based on the objectively reasonable belief that possibly uncapped needles that Defendant indicated that he had on his person posed a danger, Officer Eikam could lawfully conduct a pat down search of Defendant to remove the needles. See United States v. Carrillo, 16 F.3d 1046, 1049 (9th Cir. 1994), as amended (May 17, 1994) (noting the validity of an officer's safety concern about avoiding contact with a syringe and the possible transmission of disease).

The remaining question is whether Officer Eikam exceeded the scope of a lawful pat down search by reaching into Defendant's pockets. Officer Eikam testified that he patted down Defendant and detected an object that he could tell was a hypodermic syringe in Defendant's right front pocket.

"If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity *immediately apparent*, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) (emphasis added).  As it was immediately apparent to Officer Eikam that the object in Defendant's pocket was a hypodermic needle, Officer Eikam was authorized to reach into Defendant's pocket to remove it.

While removing the hypodermic needle, Officer Eikam detected the presence of a second object in Defendant's right front pocket. However, Officer Eikam testified that he only

discovered upon removal that the object was a shotgun shell. Officer Eikam testified that he could not tell at the time of his pat down search of Defendant whether the object remaining in Defendant's right front pocket was a hypodermic needle or a pipe. As such, the nature of the object was not immediately apparent to Officer Eikam. Because the character of the shotgun shell was not immediately apparent to Officer Eikam, Officer Eikam's subsequent removal of the shotgun shell from Defendant's pocket was not authorized under the Fourth Amendment pursuant to Terry.

      b. Search Incident to Arrest

In the alternative, the Government contends that the search of Defendant's pockets which resulted in the discovery of the shotgun shell was authorized as a search incident to arrest.

There is no evidence in the record presently before the Court that the officers inside the Apartment or Officer Eikam formally informed Defendant that he was under arrest prior to Officer Eikam's pat down search of Defendant. However, "whether an arrest has occurred for Fourth Amendment purposes does not depend upon whether the officers announced that they were placing the suspects under arrest." United States v. Rose, 731 F.2d 1337, 1342 (8th Cir. 1984) (citing Dunaway v. New York, 442 U.S. 200, 212 (1979). "[A] *de facto* arrest occurs when the officers' conduct is more intrusive than necessary for an investigative stop[.]" United States v. Bloomfield, 40 F.3d 910, 916-17 (8th Cir. 1994) (internal quotation marks and citations omitted). Factors that a court may consider when determining whether a seizure amounts to a *de facto* arrest include whether law enforcement transported a suspect and handcuffed him. Id. at 917. In the present case, the officers' authority to detain Defendant pursuant to the execution of the search warrant was limited to the immediate vicinity of the Apartment. See Bailey, 133 S. Ct. at 1042 ("A spatial constraint defined by the immediate vicinity of the premises to be searched is

therefore required for detentions incident to the execution of a search warrant."). Transporting Defendant to the local police station for questioning would have exceeded the authority of the officers to detain Defendant under Summers. Accordingly, the Court concludes that the officers' continued seizure of Defendant to transport him to the police station amounted to a *de facto* arrest. See Dunaway, 442 U.S. at 212 (holding that the detention and transportation of a suspect to police station for questioning amounted to a *de facto* arrest).

If an officer has lawfully arrested an individual, the officer may search the individual's person incident to that arrest and may reach into the individual's pockets. United States v. Pratt, 355 F.3d 1119, 1121 (8th Cir. 2004) (citing United States v. Robinson, 414 U.S. 218, 226 (1973). The Eighth Circuit has held that the search incident to arrest exception to the warrant requirement is applicable to *de facto* arrests. Pratt, 355 F.3d 1119, 1124 (8th Cir. 2004) (holding that officers lawfully searched the pockets of an individual the officers had physically restrained on probable cause to believe the individual had committed a crime, even though the officers testified that they did not subjectively believe that they had arrested the individual). "A search incident to arrest is justified by the concern for officer safety and the need to collect evidence of the offense." Id. (citing Robinson, 414 U.S. at 234). However, the Government need not establish the presence of either justification in a particular case. Id. "That is, officers need not have any reason to think the individual is armed or that evidence of the crime will be found on his person. It is the fact of arrest that enables the officer to conduct a search, not a particularized suspicion as to the suspect's dangerousness. Id. (citing Robinson, 414 U.S. at 235-36). For a warrantless search incident to arrest to be lawful, however, the arrest itself must be supported by probable cause. Henry v. United States, 361 U.S. 98, 102, 80 S. Ct. 168, 171, 4 L. Ed. 2d 134 (1959) ("And while a search without a warrant is, without limits, permissible if incident to a


lawful arrest, if an arrest without a warrant is to support an incidental search, it must be made with probable cause.").

Probable cause is determined based upon "the objective facts available to the officers at the time of the arrest." Stoner v. Watlingten, 735 F.3d 799, 803 (8th Cir. 2013) (quoting Sheets v. Butera, 389 F.3d 772, 777 (8th Cir. 2004)). "Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004).

The Government argues that Officer Eikam had probable cause to arrest Defendant on the collective knowledge of the officers who initially executed the state court warrant, based on the presence of guns and narcotics in the Apartment, and based on the subsequent discovery of the shotgun on the mattress on which the tactical response team members initially encountered Defendant. The Eighth Circuit has explained:

> Where officers work together on an investigation, we have used the so-called "collective knowledge" theory to impute the knowledge of one officer to others. United States v. Gillette, 245 F.3d 1032, 1034 (8th Cir.2001), cert. denied, 534 U.S. 982, 122 S.Ct. 415, 151 L.Ed.2d 316 (2001). We impute information if there has been "some degree of communication" between the officers. United States v. Gonzales, 220 F.3d 922, 925 (8th Cir. 2000). This requirement distinguishes officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject. See Gillette, 245 F.3d at 1034.

United States v. Terry, 400 F.3d 575, 581 (8th Cir. 2005). The close cooperation of officers in investigating and executing a search warrant is a sufficient degree of communication for a court to impute the knowledge of the officers working together to each other. United States v. Wright, 641 F.2d 602, 606 (8th Cir. 1981) (imputing knowledge of ATF special agent that shotgun was

incriminating to officer who seized the shotgun). Accordingly, the Court concludes that it may consider the collective knowledge of the officers executing the warrant, including Officer Eikam, when determining whether the officers had probable cause to arrest Defendant.

The Government first asserts that the tactical response team members had probable cause to arrest Defendant when they discovered the sawed-off shotgun on the mattress on which they first encountered Defendant (a felon prohibited from possessing a firearm). There is no indication in the record that the tactical response team members were aware at the time that they encountered him that Defendant was a felon prohibited from possession of a firearm. As discussed above, the Court may impute Officer Eikam's knowledge that Defendant was a felon prohibited from possessing a firearm to the tactical response team members. However, even though the Court may consider the collective knowledge of the officers to include the fact that Defendant was prohibited from possession of a firearm, it is unclear from Officer Eikam's testimony whether the officers discovered the shotgun before or after Defendant was frisked. As such, the Court concludes that the Government has not proven that the officers had probable cause to arrest Defendant based on the discovery of the shotgun at the time of Officer Eikam's search of Defendant's person.

However, there is an alternative basis on which the Court concludes that Officer Eikam had probable cause to arrest and therefore search the person of Defendant. Officer Eikam testified that, in response to his pre-pat down inquiry whether Defendant had any weapons on his person, Defendant indicated that he had hypodermic needles in his pocket. The possession of hypodermic needles is prohibited under Minnesota law except for statutorily enumerated individuals. See Minn. Stat. § 151.40, Subd. 1 (prohibiting possession of hypodermic needles by the general public). Defendant's admission that he had hypodermic needles in his pockets would

warrant a reasonable person to conclude that there was probable cause that Defendant had committed a crime. Accordingly, Officer Eikam had probable cause to arrest Defendant and the search of Defendant's pockets was lawful as a search incident to a *de facto* arrest. Pratt, 355 F.3d at 1121-1124.

Because Officer Eikam lawfully searched Defendant's pockets incident to a lawful *de facto* arrest, the Court recommends **DENYING** Defendant's Motion for Suppression of Evidence Obtained without a Warrant, [Docket No. 18].

**IV.   CONCLUSION**

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion for Suppression of Evidence Obtained without a Warrant, [Docket No. 18], be **DENIED**.

Dated: June 8, 2015                                                    s/Leo I. Brisbois
                                                                              Leo I. Brisbois
                                                                              U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.